SUNDAY MIRROR COMPANY OF ST. LOUIS, Appellant, v. JAMES M. GALVIN, Respondent; SUNDAY MIRROR COMPANY OF ST. LOUIS, Respondent, v. JAMES M. GALVIN, Appellant.

St. Louis Court of Appeals, December 5, 1893.

1. **Attachment**: DEBT FRAUDULENTLY CONTRACTED. The conversion of money, though fraudulent on the part of the tort feasor, will not constitute a fraudulent contraction of a debt within the purview of the statute defining the grounds of attachment.

2. **Assignment of Chose in Action**: ABSENCE OF FORMAL TRANS-
FER. A corporation was formed to carry on the business of a part-
nership. It was intended to transfer all the assets of the partnership
to the corporation in partial payment of its capital stock, but no
formal transfer was executed. Though no other payment was made,
the articles of incorporation recited that half of the capital stock had
been paid. *Held,* that members of the partnership, who had acted as
incorporators, were estopped from disputing the title of the copora-
tion to the property thus intended for it.

3. ———: ASSIGNABILITY OF CONTRACT RIGHTS. A contract which
stipulates for the support of a newspaper for a publication, does not
rest on a personal confidence. The owners of the newspaper may
therefore assign their rights under it to a corporation formed to con-
duct the newspaper.

*Appeal from the St. Louis City Circuit Court.*—HON.
JOHN A. HARRISON, Special Judge.

AFFIRMED.

*D. P. Dyer* for plaintiff.

*Charles F. Joy* and *D. B. Kribben* for defendant.

(1) "Old and New St. Louis" was a trust fund,
and it and the contract, from their very nature, could
not be assigned by Fanning & Galvin without the con-
sent of Mather & Blood. *Boykin v. Campbell,* 9 Mo.
App. 495; *Lansden v. McCarthy,* 45 Mo. 106; *Arkansas,
etc., Co. v. Belden,* 127 U. S. 379; *Board of Commis-
sioners v. Diebold,* 133 U. S. 473. (2) The evidence
fails to show the assent of Mather & Blood to the
assignment of a contract, the nature of which discloses
a credit extended to, and a trust and confidence reposed
in, the persons of Fanning & Galvin; hence no title can
vest in the assignee in such contract or any part of it,
without the consent of the other parties, and no action
will lie thereon in favor of the assignee. Authorities
above cited.

BIGGS, J.—This is an action for money had and
received, with an attachment in aid. The plaintiff

appeals from a judgment against it on the plea in abatement. The defendant appeals from a judgment against him on a trial of the merits.

The petition states substantially the following facts: In the month of February, 1891, the defendant and one M. A. Fanning entered into a copartnership for the purpose of printing and publishing a weekly newspaper in the city of St. Louis, to be called the *Sunday Mirror* The style of the firm was Fanning & Galvin. Each party contributed about $1,500 to the capital of the concern. The necessary materials were purchased, and the publication of the paper commenced. In October, 1891, Fanning & Galvin as publishers of this paper entered into a contract with Mather & Blood, who were publishing a history of the city of St. Louis in book form under the title of "Old and New St. Louis." The agreement reads: "This agreement, made and entered into between Messrs. Fanning & Galvin, publishers of the *Sunday Mirror* of St. Louis, of the first part, and Mather & Blood of the second part, for the publishing of the history of the city of St. Louis in book form, under the title of "Old and New St. Louis," under the auspices and in the co-operative name of the *Sunday Mirror* upon the following provisions:

"*First.* In consideration of twenty-five per cent. of the net profits (over and above all expenses), the said Fanning & Galvin, of the first part, do hereby agree to give Mather & Blood, of the second part, their full support, and use of the co-operative name of the *Sunday Mirror* in any way pertaining to and securing of business for the said work.

"*Second.* Mather & Blood, of the second part, do hereby agree to attend to all details in the management of securing business and publishing of said work; and do further agree to make all collections in the name of

said Fanning & Galvin, who agree to cash all checks at any time called for, retaining twenty-five per cent. of such collections as a guarantee until the final settlement, unless otherwise required to be used in making the publication or printing of said work. Mather & Blood do further agree to make a full statement of business done at any time called for by said Fanning & Galvin.''

This contract was in force on the twenty-fifth day of February, 1892, when Fanning and Galvin agreed to organize a corporation, to be known as ''The Sunday Mirror Company,'' with a capital stock $50,000, divided into five hundred shares of $100 each. Fanning and Galvin subscribed for all of the shares, except two or three which were given to other parties in order to effect the incorporation; and it was agreed that the entire capital stock should be paid by a transfer to the proposed corporation of all the assets of the firm of Fanning & Galvin. In pursuance of this agreement, articles of incorporation were drawn up and were acknowledged by the defendant and the other stockholders, in which they certified that one-half of the capital stock, to-wit, $25,000, was paid in money. The defendant was named as a member of the board of directors. A certificate of incorporation was issued on March 8, 1892, and thereafter the new company became the owner of all of the assets of Fanning & Galvin including the emoluments (if any) arising from the contract with Mather & Blood, to which the latter consented. At the time the corporation was formed, Fanning & Galvin had deposited with the Laclede National Bank, in the name of the firm, all money received by them under the contract with Mather & Blood, and they had given to the latter checks for seventy-five per cent. of such collections, retaining, themselves, twenty-five per cent., as provided by the terms of

the contract. After the incorporation of the plaintiff, this bank account was permitted to remain in the name of Fanning & Galvin, and all moneys thereafter collected by the plaintiff on account of the contract with Mather & Blood, and from all other sources, were placed to the credit of this account. Prior to the incorporation, Fanning had control of the editorial department of the paper and the defendant was the business manager, both parties having authority to draw checks against the bank account of the firm. After the incorporation, Fanning was elected president, and the defendant secretary and treasurer, of the corporation, the duties and powers of neither being in any substantial manner changed. On the twenty-first day of March, 1892, another contract with Mather & Blood was substituted for the first one, so that the plaintiff should receive fifty per cent. instead of twenty-five per cent. of the net profits arising from the publication of the history. In this respect *only* was the old contract modified or changed. The modified contract was also made in the name of Fanning & Galvin. The banking business of the plaintiff was conducted, as before, in the name of the firm of Fanning & Galvin, until the third day of June, 1893, when the account was closed with the Laclede National Bank, and a new one opened in plaintiff's name with the St. Louis National Bank. A few days prior to the last mentioned date, the defendant commenced negotiations with George D. Dyer for the sale of his stock, which resulted in a purchase by Dyer on June 1 for $4,000 cash. At the time these negotiations commenced the plaintiff had accumulated in bank about $2,000 from collections under the contract with Mather & Blood, which it had a right under the contract to retain. During the pendency of the negotiations, to-wit, on May 28, the defendant, by check, transferred $1,000 from the bank account, standing in

the name of Fanning & Galvin, to his individual account in the same bank, which he afterwards checked out and put into his pocket. The defendant concealed this from Dyer and the officers of the plaintiff until after he had gotten the money from Dyer. A short time previous to this the defendant had also, without the consent of plaintiff, withdrawn from the bank the additional sum of $2,000, the money of the plaintiff, and he also converted it to his own use.

Upon this alleged state of facts the plaintiff brought the action, and in the affidavit for attachment it was stated that *the debt sued for was fraudulently contracted.* This was the only ground for attachment.

On the trial of the plea in abatement, which was submitted to the court sitting as a jury, and also on the subsequent trial on the merits, the plaintiff's evidence tended to prove the facts alleged in the petition, and its evidence also tended to show that the defendant, in the negotiations with Dyer for the purchase of his stock, represented to him that the contract with Mather & Blood was an asset of the corporation, and that a considerable amount of money had been collected under that contract, and was then on deposit in bank.

At the close of the trial on the plea in abatement the court gave the following instruction, to which the plaintiff excepted: "Although the court, sitting as a jury, may find and believe from the evidence that the $1,000 mentioned in evidence was the property of the plaintiff, and that defendant wrongfully and fraudulently drew the same out of bank and converted it to his own use, still, if the court further finds and believes from the evidence that plaintiff never consented or agreed to the drawing out and conversion of said money by defendant, but protested against the same as soon as known to it, and, upon discovering that defendant had drawn out and converted said money, demanded

of him that he should return the same, and, upon his failure or refusal so to do, thereupon began this suit, then the finding and judgment must be for the defendant."

Thereupon the court found the issue for the defendant and entered a judgment dissolving the attachment.

It is contended by counsel for defendant that the instruction and the finding thereunder were in conformity with the decision of the supreme court in the case of *Finlay v. Bryson*, 84 Mo. 664. In this statement my associates fully concur.

The two cases cannot very well be distinguished as to their essential facts touching the right of attachment. Therefore, I am not prepared to dissent from the conclusion reached by the other members of the court. Yet the application of the governing principle to the facts in the *Finlay–Bryson case* is so unsatisfactory to me, that I deem it neither out of place nor indelicate to express my dissatisfaction.

Finlay delivered to Bryson four mules (the property of Finlay), with directions to sell them and to deposit the proceeds of sale to Finlay's credit. Bryson made the sale and received the money, but instead of depositing it he subsequently converted it. He also, at the same time, and without any authority whatever, withdrew from Finlay's deposit other money amounting $180, and he likewise converted it. Commissioner Martin decided that these facts failed to show that a "debt had been fraudulently contracted" within the meaning of the attachment law. The reasoning of the learned commissioner is to the effect that, where the *gravamen* of the complaint lies in *tort*, there can be no *debt* within the meaning of the attachment law. Thus, if the right of recovery is based solely on the wrongful conversion of property, the right of recovery does

not rest in *debt,* but is one for damages resulting from the wrongful acts of the wrongdoer. The rule to be deduced from the decision is that, to authorize an attachment for a debt fraudulently contracted, the conduct of the defendant must have *culminated in a debt.*

I can very well understand how the conclusion was reached that the money withdrawn from bank could not be treated as the foundation for a debt proper. As to that money, the act of Bryson was a tort, pure and simple. It is true that Finlay could have waived the tort and sued *in assumpsit* for the money, as he did do; but it would not have been quite logical to have permitted him to have made the tort, which he had waived, the ground of his right of attachment. But I am puzzled to understand how the same rule could be made to apply to the money received by Bryson for the mules. He sold the mules as an agent, and the moment he received the proceeds he became the debtor of Finlay. How the subsequent conversion of the money changed the character of the transaction I can not conceive. If, therefore, at the time Bryson received the money he had made up his mind to convert it, these facts would present a clear case of a *debt fraudulently contracted.*

So, in the case at bar, all the evidence shows that the defendant, as the secretary and treasurer of the plaintiff, and also as a member of the firm of Fanning & Galvin, had the right to draw checks against the plaintiff's bank account (which was kept in the name of Fanning & Galvin), and to receive the money thereon. Neither the signing nor the cashing of the check was wrongful of itself. Therefore, if the money withdrawn by the defendant belonged to the plaintiff, or if it had the right under the contract with Mather & Blood to retain it, and the defendant withdrew it with the preconceived design to deprive the plaintiff of

it, then I cannot understand upon what theory there is no debt and that it was not fraudulently contracted.

It will be observed that the instruction as written proceeds upon the idea, that the act of Galvin in withdrawing the money was of itself wrongful and unauthorized. There is no foundation in the evidence for any such hypothesis. But as the Bryson case is to be followed, this would make no difference, for there Bryson received the money for the mules under direct authority from Finlay.

As the instruction is the only matter complained of on the trial of the plea in abatement, it follows that the judgment of the circuit court dissolving the attachment will be affirmed.

On the other branch of the case the contention of the defendant is that under the law and the evidence the plaintiff was not entitled to a judgment. The argument rests on three propositions: *First*. That the contract with Mather & Blood was not an asset of the corporation. *Second*. That there is no evidence of its transfer from Fanning & Galvin. *Third*. That there is no evidence that Mather & Blood consented to the change.

The defendant admits that the capital stock of .the plaintiff corporation consisted *only* of the assets of the firm of Fanning & Galvin as the owners and publishers of the *Sunday Mirror*. The contract with Mather & Blood shows on its face that the consideration, which moved them, was to secure the co-operative influence of the newspaper in aid of their enterprise, and not the personal influence and aid of Fanning & Galvin, aside from their connection and control of the paper. This refutes the idea that the contract was independent and wholly disconnected from the business of Fanning & Galvin as publishers.

But it is urged that there is nothing in the record

to show a formal transfer of the contract, or of any of the assets of the firm of Fanning & Galvin, to the plaintiff. This is true. But the defendant admits that the capital stock of the plaintiff was intended to be paid by a transfer of all the assets of his firm. He executed the articles of incorporation, in which he certified that one-half of the capital stock, to-wit, twenty-five thousand dollars, had been fully paid. Under such a state of facts the defendant ought to be, and he is, estopped from denying that the assets of Fanning & Galvin, which *alone* represented the paid-up capital of plaintiff, and which outside of the good will of the paper were not worth one-fifth of the amount for which the concern was capitalized, had not been transferred.

The authorities cited in support of the third proposition show merely that, where the obligations of a contract rest upon a personal confidence reposed in one of the contracting parties, he can not delegate the performance to a stranger without the assent of the other contracting party. As we have shown, the contract of Mather & Blood was one in which no particular confidence was reposed in Fanning & Galvin as individuals. The object of Mather & Blood was to secure the influence of the paper, and it could make no possible difference to them whether the paper was published by Fanning & Galvin, or by a corporation formed by them for that purpose. But the record contains substantial evidence that Mather & Blood were advised of, and consented to, the change. This issue was submitted to the jury, and was found in favor of the plaintiff, which leaves the defendant no room for complaint.

Our conclusion is that the appeal on this branch of the case is entirely without merit. The judgment will, therefore, be affirmed with ten per cent. damages, as asked by plaintiff. All the judges concur.